UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

CIVIL ACTION NO. 2:17-cv-00008-DLB-EBA

TODD BONDS,                                                                    PLAINTIFF,

v.                              **MAGISTRATE JUDGE'S**
                            **REPORT AND RECOMMENDATION**

JAMES DALEY, et al.,                                                          DEFENDANTS.


This matter comes before the Court on Plaintiff's Motion for Summary Judgment [R. 40], Defendants' Motion for Summary Judgment [R. 41], and Defendants' Motion to Declare Plaintiff a Vexatious Litigator [R. 44]. Having considered the matters fully, and being otherwise sufficiently advised, the undersigned will recommend Plaintiff's Motion for Summary Judgment [R. 40] be denied, Defendants' Motion for Summary Judgment [R. 41] be granted, and Defendants' Motion to Declare Plaintiff a Vexatious Litigator [R. 44] be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 9, 2015, after being convicted of theft by failure to make a required disposition, Plaintiff, Todd Bonds, was placed on felony diversion and released on probation. [R. 41, at 3; R. 41-1, at 1]. After violating the terms of his probation, the Campbell Circuit Court revoked Plaintiff's diversion and probation, and sentenced him to one year in prison. [R. 41-1, at 1]. On November 18, 2015, Plaintiff was arrested and lodged in the Campbell County Detention Center ("CCDC"). [R. 41, at 3; R. 41-1, at 2; R. 41-2].

During intake at CCDC, Plaintiff completed and signed a form titled "Standard Medical Questions." [R. 41, at 3; R. 41-3]. On the aforementioned form, Plaintiff reported he took Metformin for Type 2 Diabetes and several unspecified medications for hypertension. [R. 41-3].

Throughout Plaintiff's incarceration at CCDC, the jail physician prescribed various medications for Plaintiff's diabetes and hypertension. [R. 41, at 4 (citing [R. 41-4; R. 41-5]; R. 43, at 19])].

A few days prior to December 18, 2015, Plaintiff addressed his first "'Open Records Request' to [CCDC's] 'Administrative Office' and requested 'documentation on proving the starting salary of (1) Correctional Officer Trainee; (2) Correctional Deputy Officer; (3) Correctional Officer SGT.'" [R. 41, at 4 (citing [R. 41-6; R. 43, at 11]]).

On December 18, 2015, Major Nagel replied to Plaintiff's first Open Records Request. [R. 40-2; R. 41-6]. In his response, Major Nagel cited to K.R.S. § 61.878(1)(l), which exempts from disclosure "[p]ublic records or information the disclosure of which is prohibited or restricted or otherwise made confidential by enactment of the General Assembly," and K.R.S. § 197.025(2), which provides, "[T]he department shall not be required to comply with a request for any record from any inmate confined in a jail or any facility or any individual on active supervision under the jurisdiction of the department, unless the request is for a record which contains a specific reference to that individual." [R. 41-6]. During Plaintiff's October 23, 2017 deposition, Plaintiff expressed his belief that Major Nagel's response violated the Kentucky Open Records Act ("KORA") "[b]ecause the letter doesn't come from anybody in particular. He doesn't sign it, Major Nagel." [R. 43, at 12]. Also during the deposition, Plaintiff stated, "I mean, that makes sense. Okay. You're a prisoner, you can only get records that pertain to you. I don't know if that's accurate or not, I just followed it." *Id.,* at 13. However, in Plaintiff's November 30, 2017 Motion for Summary Judgment [R. 40], Plaintiff agreed "[t]he request was properly denied as Plaintiff was told being an inmate or parolee, the requestor could inspect records that pertained to him." [R. 40, at 3-4].

Despite initially believing Major Nagel's December 18, 2015 response violated KORA, Plaintiff did not pursue either an administrative appeal to the Kentucky Attorney General or a

judicial appeal, as required by K.R.S. § 197.025(3). [R. 43, at 12-13]. Instead, on December 18, 2015, Plaintiff made a second Open Records Request to "CCDC Admin" stating, "Under KORA 61.872-61.884, I am seeking copies of all documents that were signed by me since 11/18/15; including all medical related signatures and grievances as well." [R. 40-3, at 2; R. 41-7].

When CCDC did not respond to Plaintiff's December 18, 2015 request [R. 40-3, at 2; R. 41-7], Plaintiff did not pursue either an administrative appeal to the Kentucky Attorney General or a judicial appeal. [R. 43, at 13]. Instead, on December 25, 2015, Plaintiff submitted a third Open Records Request to "Admin CCDC" reiterating his request for the records he requested on December 18, 2015. [R. 40-3, at 3; R. 41-8]. Again, when Plaintiff did not receive a response from CCDC, Plaintiff did not seek either administrative or judicial appeal. [R. 43, at 14].

On January 13, 2016, Plaintiff submitted a fourth Open Records Request to CCDC's "Open Records Custodian" "seeking an opportunity to inspect all records that mention him or that he is signed in. This includes emails between CCDC staffers & medical personnel; medical records including prescriptions; grievances filed; medical call slips and any other records that mention him." [R. 40-3, at 4; R. 41-9]. On January 15, 2015, after receiving Plaintiff's January 13, 2016 Open Records Request [R. 40-3, at 4; R. 41-9], Defendant Lieutenant Colonel Marc D. Brandt sought the legal advice of Robert List, an Assistant Campbell County Attorney before responding to Plaintiff. [R. 40-5, at 2-3; R. 41-10]. On January 18, 2016, Mr. List directed Defendant Brandt's attention to K.R.S. § 197.025(4), which provides, "[T]he Department of Corrections shall refuse to accept the hand delivery of an open records request from a confined inmate." [R. 40-5, at 2-3; R. 41-10]. Also, taking into consideration Plaintiff's Open Records Request [R. 40-3, at 4; R. 41-9] was dated January 13, 2016, Mr. List advised Defendant Brandt that "[CCDC] has 5 business

days, excluding Saturdays, Sundays, and legal holidays. The day of receipt is not counted, so the notice is two days old. The response needs to be made by Thursday." [R. 40-5, at 2-3; R. 41-10].

In addition to Plaintiff's four (4) Open Records Requests [R. 40-2; R. 41-6; R. 40-3, at 2; R. 41-7; R. 40-3, at 3; R. 41-8; R. 40-3, at 4; R. 41-9] from on or about December 18, 2015 to on or about January 13, 2016, Plaintiff submitted at least four (4) Inmate Grievance Forms regarding the treatment Plaintiff received from CCDC's medical staff. [R. 40-4].

In Defendant Daley's Objections and Answers to Plaintiff's First Set of Interrogatories [R. 41-11], Defendant Daley, CCDC Jailer, stated that on January 21, 2016, "Lt. Sarah Tate, Population Coordinator, selected Plaintiff and 12 other inmates to be transferred to [the Todd County Detention Center ("TCDC")] for population control at the CCDC." [R. 41-11, at 2]. Defendant Daley stated the criteria for transferring an inmate to another facility was as follows: "Decisions to transfer are based upon a multitude of factors including inmate behaviors, the underlying charges, safety issues, length and duration of sentences and jail population." *Id.* at 3. Furthermore, Defendant Daley stated Plaintiff was not able to continue serving his sentence at CCDC because "at the time Plaintiff was sent to [TCDC], he was not leveled/classified by the Department of Correction and was not eligible for any work program." [R. 41-13, at 4-5].

Of the twelve (12) inmates transferred to TCDC, Plaintiff was the only one who made Open Records Requests to CCDC. *Id.* at 2-3. Defendant Daley approved the transfer of Plaintiff to TCDC. *Id.* at 6. In transferring Plaintiff to TCDC, CCDC sent a supply of medication along with Plaintiff, including Clonidine, HCTZ, and Glimepiride, and made the Transportation Officer aware of Plaintiff's heart condition. [R. 41-14].

Also on January 21, 2016, Defendant Brandt responded to Plaintiff by letter, notifying Plaintiff "that in order to process a request for open records it must be sent to the Campbell County

Detention Center via the U.S. mail or via facsimile machine." [R. 40-5, at 4]. Additionally, Defendant Brandt's January 21, 2016 letter instructed Plaintiff to mail or fax any requests to Defendant James A. Daley, Jailer, and Defendant Brandt provided Defendant Daley's address and facsimile number. *Id.* Despite thinking Defendant Brandt's response violated KORA, Plaintiff did not seek either administrative or judicial appeal. [R. 43, at 16].

On January 23, 2017, *pro se* Plaintiff filed the present action against Defendants Daley and Brandt, in their official and individual capacities, and an Unidentified Nursing Employee of Southern Health Partners, Inc., "a private entity that is under contract with Campbell County to provide medical care for inmates at [CCDC]" [R. 41, at 4 n. 1]. [R. 2]. Pursuant to 42 U.S.C. § 1983, Plaintiff alleges Defendants violated his First Amendment rights by transferring him to TCDC in an act of retaliation for Plaintiff making Open Records Requests and submitting Inmate Grievance Forms regarding Plaintiff's medical treatment at CCDC. [R. 2, at 4-5]. In what Plaintiff argues is further retaliation against him, Plaintiff alleges neither CCDC nor its medical staff "sent the proper or required prescribed medicine with Plaintiff to [TCDC], according to the Jailer at [TCDC]." *Id.* at 5. Additionally, Plaintiff alleges Defendants violated Plaintiff's Eighth Amendment rights because "the employee(s) responsible for sending Plaintiff's medicines with him purposely did not because Plaintiff was deemed a troublemaker for making legal Open record [sic] Requests." *Id.* at 5. Also, Plaintiff alleges Defendants Daley and Brandt violated KORA. *Id.* at 6. Finally, Plaintiff makes a conspiracy claim, arguing "Defendants knowingly and willfully initiated a plan to punish Plaintiff by Retaliation and purposefully not sending Plaintiff's medicines with Plaintiff once he was transferred to [TCDC]." *Id.* at 6. On January 25, 2017, Plaintiff's Motion for Leave to Proceed *in forma pauperis* [R. 5] was granted. [R. 7].

5

On November 30, 2017, both Plaintiff [R. 40] and Defendants Daley and Brandt [R. 41] moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56. Also on November 30, 2017, Defendants Daley and Brandt moved to declare Plaintiff a vexatious litigator due to Plaintiff's history as an allegedly frivolous and abusive litigator in other cases and in the present case. [R. 44]. In the event the Court declares Plaintiff a vexatious litigator, Defendants request the Court sanction Plaintiff in the following ways: (1) prohibit Plaintiff from "filing any additional complaints or other pleadings in the Eastern District of Kentucky unless an attorney in good standing with the Court is willing to certify that the complaint or other pleading is not frivolous;" and (2) prohibit Plaintiff from "proceeding *in forma pauperis* before the Court." *Id.* at 20-21.

## DISCUSSION

Since the Parties' Motions for Summary Judgment [R. 40; R. 41], and related responsive pleadings, concern the same facts, the Court will consider the Parties' Motions for Summary Judgment [R. 40; R. 41] together. However, due to the unique factual background and arguments made in Defendants' Motion to Declare Plaintiff a Vexatious Litigator [R. 44], the Court will consider declaring Plaintiff a vexatious litigator [R. 44] separately.

## A. MOTIONS FOR SUMMARY JUDGMENT

As previously mentioned, both Plaintiff and Defendants move for summary judgment. [R. 40; R. 41]. In summary, Plaintiff argues no reasonable jury would find for Defendants because:

> There is clearly enough evidence that shows that due to Plaintiff's repeated filings of grievances and insistence on being allowed to inspect the records that were no [sic] allowed to be inspected beginning with the date 12/25/2015, that Plaintiff was transferred so that he wouldn't continue to be a headache for the "CCDC" and possibly inspire the inmates there to be aware of the few remaining rights an inmate has.

[R. 40, at 7]. Defendants, on the other hand, argue they "are entitled to judgment as a matter of law on all of [Plaintiff's] claims," in their official and individual capacities. [R. 41, at 27]. Since

Defendants' Motion [R. 41] and Defendants' Response [R. 47] make the same arguments, the Court will consider the Parties' Motions for Summary Judgment [R. 40; R. 41] together.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pennington,* 553 F.3d at 450 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp*. *v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative

evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Pennington v. State Farm Mut. Automboile Ins. Co.,* 553 F.3d 447, 450 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Before considering Plaintiff's arguments for why summary judgment should be granted, the Court must first consider whether Defendants are entitled to summary judgment in both their official and individual capacities on all of Plaintiff's federal claims and whether Defendants are entitled to qualified immunity.

## 1. PLAINTIFF'S CLAIMS AGAINST DEFENDANTS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES

First, in their official capacities, Defendants argue they "are entitled to summary judgment on [Plaintiff's] 42 U.S.C. § 1983 claims in Counts I, II and IV of his Complaint." [R. 41, at 9]. In cases under 42 U.S.C. § 1983, "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents . . . ." *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985); *see also Kentucky v. Graham,* 473 U.S. 159 (1985). Accordingly, an official capacity suit is "only another way of pleading an action against an entity of which an officer is an agent." *Graham,* 473 U.S. at 165-66 (citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55 (1978)). Therefore, Plaintiff's federal claims against Defendants are equivalent to claims against Campbell County, the government entity that employs them.

Under 42 U.S.C. § 1983, even if Defendants deprived Plaintiff of a constitutional right, Plaintiff must prove the execution of a government's policy or custom was the moving force behind the deprivation. *Monell*, 436 U.S. at 691-94; *City of Canton, Ohio v. Harris,* 489 U.S. 378, 379 (1989). "'[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 121 (1992) (citing *Monell*, 436 U.S. at 691). "This circuit has stated that to satisfy the Monell requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dept.,* 8 F.3d 358, 364 (6th Cir. 1993) (citing *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir. 1987)).

In the present case, Plaintiff has failed to provide any evidence to prove, or even allege, a policy or custom of Campbell County was the moving force behind any of the alleged constitutional deprivations. Therefore, the Court will recommend Defendants' Motion for Summary Judgment [R. 41] be granted on Plaintiff's official capacity claims.

Second, in their individual capacities, Defendants argue they "are entitled to summary judgment on [Plaintiff's] 42 U.S.C. § 1983 claims in Counts I, I [sic] and IV of his Complaint." [R. 41, at 9]. Each of Plaintiff's federal claims relate to the decision to transfer Plaintiff from CCDC to TCDC and the allegation that Defendants did not send all of Plaintiff's medication with him when he was transferred. [R. 2]. Since *respondeat superior* does not apply in 42 U.S.C. § 1983 claims, "a supervisory official may not be held liable under § 1983 for the misconduct of those the official supervises unless the plaintiff demonstrates that 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Combs v. Wilkinson,* 315 F.3d 548, 558 (6th Cir. 2002) (citing *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984)). "At

9

a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Combs,* 315 F.3d at 558 (citing *Hays v. Jefferson County, Ky.,* 668 F.2d 869, 874 (6th Cir. 1982)).

Defendants were not the CCDC employees who made the decision to transfer Plaintiff nor were they personally involved in sending Plaintiff's medications with him during transport to TCDC. However, while Lt. Sarah Tate was the individual who ordered Plaintiff's transfer to TCDC [R. 41-11, at 2-3], Defendant Daley approved Plaintiff's transfer to TCDC [R. 40-6, at 7]. Accordingly, the Court will recommend Defendants' Motion for Summary Judgment [R. 41] be granted on Plaintiff's individual capacity claims, but only as they pertain to Defendant Brandt. Since Defendant Daley approved the allegedly unconstitutional conduct of Lt. Sarah Tate [R. 40-6, at 7], Defendant Daley has been shown to have had enough personal involvement for Plaintiff to proceed against Defendant Daley in his individual capacity.

## 2. WHETHER DEFENDANT DALEY IS ENTITLED TO QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To overcome a qualified immunity defense, "a plaintiff must show that, when the facts are viewed in the light most favorable to him, (1) the defendant deprived him of a constitutionally protected right, and (2) the right was 'clearly established' at the time of the violation." *Gradisher v. City of Akron,* 794 F.3d 574, 583 (6th Cir. 2015) (citing *Morrison v. Bd. of Trustees of Green Twp.,* 583 F.3d 394, 400 (6th Cir. 2009)). "'Courts may [ ] address these prongs in either order; indeed one may be dispositive.'" *Gradisher,* 794 F.3d at 583 (citing *Austin v. Redford Twp. Police Dep't,* 690 F.3d 490, 496 (6th Cir. 2012));

*see also Martin v. City of Broadview Heights,* 712 F.3d 951, 957 (6th Cir. 2013) ("If either one is not satisfied, qualified immunity will shield the officer from civil damages.").

To determine a right is "clearly established," the Court must "identify a case where an [individual] acting under similar circumstances as [Defendant] was held to have violated the [Constitution]." *White v. Pauly,* 137 S.Ct. 548, 552 (2017). For qualified immunity to apply, "the right's contours [must be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted); *see also Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005). In this determination, the clearly established right at issue must be narrowly construed. Courts "'are not to define clearly established law at a high level of generality,' since doing so avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S.Ct. at 2023 (quoting *Ashcroft v. al-Kidd*, 536 U.S. 731, 742 (2011)).

Here, to determine whether Defendant Daley deprived Plaintiff of a constitutionally protected right, the Court will consider Plaintiff's First and Eighth Amendments claims.

### a. PLAINTIFF'S RETALIATION CLAIM

To succeed on his First Amendment retaliation claim, Plaintiff must prove:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (citations omitted).

11

Regarding the first element, Plaintiff argues his four (4) Open Records Requests constitute constitutionally protected conduct because "there is no law preventing Plaintiff from requesting to inspect open records." [R. 40, at 4].

Defendants contest Plaintiff "has not established that requesting documents under a records statute constitutes constitutionally protected conduct." [R. 47, at 10]. However, while Plaintiff's aforementioned reasoning lacks merit [R. 40, 4], "Sixth Circuit case law suggests that an Open Records Request is an act of speech that may qualify for First Amendment protection." *Ross v. Board of Educ. of Mason County,* No. 13–186–DLB–CJS, 2015 WL 1321885, at *12 (E.D. Ky. Mar. 24, 2015) ("[T]he Court concludes that Ross' Open Records Request is 'speech' . . .") (citing *Handy–Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 545 (6th Cir. 2012) (noting that the plaintiff's claim was "supported by the close temporal proximity between [her] e-mails informing her superiors about her requests for various records and her termination"); *Handy–Clay v. City of Memphis,* No. 10–2927–STA–tmp, 2013 WL 5305239 at *13 (W.D. Tenn. Sept. 19, 2013) (holding that "the Plaintiff's act of filing the records request constituted a protected speech activity for purposes of her First Amendment retaliation claim")). Therefore, Plaintiff's Open Records Requests constitute constitutionally protected conduct for purposes of his First Amendment retaliation claim.

Regarding the second element of his retaliation claim, Plaintiff argues an adverse action was taken against him when he "was transferred from 'CCDC' to the 'TCDC' for no apparent reason other than Plaintiff's requesting open records." [R. 40, at 4]. Regarding adverse actions, "[i]n the prison context, an action comparable to transfer to administrative segregation would certainly be adverse." *Thaddeux-X,* 175 F.3d at 396 (citations omitted). In the present case, while Plaintiff was not segregated from other prisoners, he was transferred from one jail to another, and

the jail Plaintiff was transferred to, TCDC, was over 250 miles away from Plaintiff's residence in Cincinnati, OH. Since being transferred to a jail over 250 miles away from an inmate's residence would "deter a person of ordinary firmness" from continuing to make Open Records Requests, the Court finds Plaintiff's transfer from CCDC to TCDC could constitute an adverse action. *Id.* at 394.

In order to satisfy the third and final element of his retaliation claim, Plaintiff must prove his transfer "was motivated at least in part by" his Open Records Requests. A motivating factor is "'one without which the action being challenged simply would not have been taken.'" *Handy-Clay*, 695 F.3d at 545 (citing *Holzemer v. City of Memphis,* 621 F.3d 512, 525 (6th Cir. 2010)). Plaintiff "must point to specific, nonconclusory allegations reasonably linking [his] [conduct]" to his transfer. *Vereecke v. Huron Valley School Dist.,* 609 F.3d 392, 400 (6th Cir. 2010). Further, "[w]hen assessing motive in the context of a summary judgment motion, '[B]are allegations of malice [do] not suffice to establish a constitutional claim.'" *Id.* at 399-400 (citing *Crawford–El v. Britton,* 523 U.S. 574, 588 (1998)). Likewise, "'conclusory allegations of temporal proximity are not sufficient to show retaliatory motive.'" *Robinson v. Parker,* No. 5:12-cv-00045-TBR, 2013 WL 3992450, at* 4 (W.D. Ky. Aug. 2, 2013) (citing *Skinner v. Bolden,* 89 F. App'x 579, 579-80 (6th Cir. 2004)). "'A defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury.'" *Handy-Clay*, 695 F.3d at 545 (citing *Paige v. Coyner,* 614 F.3d 273, 282 (6th Cir. 2010)). However, the Court may consider motive in the context of a motion for summary judgment, and when the Court does so and finds the plaintiff's protected conduct was a motivating factor behind any harm, the burden shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *see also Vereecke,* 609 F.3d at 400 (citations omitted).

13

In the present case, Plaintiff first attempts to establish a causal connection by alleging "Plaintiff was told by several 'career' inmates and then white male 'CCDC' employee, Sgt. Wright that if Plaintiff continued to file grievances and requests for open records, 'they' would transfer him to punish him." [R. 40, at 5]. However, there is no evidence to support this allegation. Furthermore, Plaintiff saying "'they' would transfer him to punish him" is vague as to whether "they" is referring to Defendants or someone else. *Id.*

Next, Plaintiff attempts to establish a causal connection between his Open Records Requests and his transfer by directing the Court's attention to the fact that he did not receive a response to his Open Records Requests dated December 18, 2015, December 25, 2015, and January 13, 2016 until January 21, 2016, the day he was transferred. *Id.* at 5-6. Plaintiff being transferred the same day he received a response could, at first glance, appears suspicious, but further review of the sequence of events and K.R.S. § 197.025 quells any suspicions. Specifically, Defendant Brandt's January 21, 2016 response was timely because, pursuant to K.R.S § 197.025, that was the day a response was due.

K.R.S. § 197.025(4) states, "[T]he Department of Corrections shall refuse to accept the hand delivery of an open records request from a confined inmate." Here, each of Plaintiff's Open Records Requests were placed in a jail dorm mailbox at CCDC. [R. 43, at 12-15]. The record does not indicate that Plaintiff mailed his Open Records Requests. Instead, Defendants argue Plaintiff hand-delivered his requests. [R. 41, at 4-6]. Accordingly, Plaintiff's January 13, 2016 Open Records Request went "through one or more deputy jailers, where it was provided to Defendant, Marc Brandt." *Id.* at 6. Defendant Brandt then sought the advice of counsel and was instructed not to accept hand-delivered Open Records Requests. [R. 41-10]. Therefore, on January 21, 2016, Defendant Brandt responded to Plaintiff's January 13, 2016 Open Records Request by informing

14

Plaintiff all Open Records Requests must be sent to Defendant Daley "via U.S. Mail or via facsimile machine" and providing Defendant Daley's address and facsimile number. [R. 41-15].

Regarding the date of Defendant Brandt's response, K.R.S. § 197.025(7) states, "[T]he department shall respond to the request within five (5) days after receipt of the request, excepting Saturdays, Sundays, and legal holidays, and state whether the record may be inspected or may not be inspected, or that the record is unavailable and when the record is expected to be available." Plaintiff's fourth request was made on Wednesday, January 13, 2016. [R. 40-3, at 4; R. 41-9]. As Defendants correctly assert, "January 16, 2016 was a Saturday; January 17, 2016 was a Sunday; and January 18, 2016 was Martin Luther King Day, a legal holiday. Excluding those days, January 21, 2016 was the fifth day after the request . . . ." [R. 47, at 12]. The response was not, in fact, "at least 3 days late and it is not incompliance with 'KORA,'" as Plaintiff argues. [R. 40, at 5]. Therefore, Defendant Brandt's January 21, 2016 response was timely.

Plaintiff then argues that in Defendant Brandt's e-mail exchange with Assistant Campbell County Attorney Robert List, where Defendant Brandt was asking how to respond to Plaintiff's January 13, 2016 Open Records Request [R. 41-10], "[t]he people writing on the email appear to be trying to find reasons to not answer Plaintiff's request dated 1/13/16." [R. 40, at 6]. However, it is clear from the email that Defendant Brandt was explaining the contents of the January 13, 2016 Open Records Request, and Mr. List was doing nothing more than advising Defendant Brandt how to proceed with a response in accordance with K.R.S. § 197.025. [R. 41-10]. Any suggestion to the contrary is thwarted by the contents of the e-mail exchange. *Id.*

Lastly, Plaintiff argues there was a causal connection between his Open Records Requests and his transfer because he "was the only non-violent offender transferred on the day he was transferred, and he was the only inmate of the 12 transferred who made requests for open records."

15

[R. 40, at 6]. However, since five (5) of the other eleven (11) inmates transferred on January 21, 2016 were non-violent offenders, the record does not support the first part of Plaintiff's argument. [R. 41-13, at 2-3]. Indeed, out of the twelve (12) inmates transferred to TCDC, Plaintiff was the only one who made Open Records Requests to CCDC. *Id.* However, Plaintiff has provided no evidence that supports his argument that CCDC's decision to transfer him was based on his Open Records Requests. Instead, as previously mentioned, Defendant Daley asserted Plaintiff and the other eleven (11) inmates were transferred "for population control at the CCDC" [R. 41-11, at 2], and Plaintiff was unable to continue serving his sentence at CCDC because Plaintiff "was not leveled/classified by the Department of Correction and was not eligible for any work program." [R. 41-13, at 4-5]. Defendants assert that "jails have less flexibility in housing . . . inmates" that have not been classified by the Department of Corrections. [R. 47, at 14]. Even if Plaintiff had been able to show a causal connection between his Open Records Requests and his transfer, Defendants have shown that CCDC "would have reached the same decision . . . even in the absence of the protected conduct." *Doyle,* 429 U.S. at 287; *see also Vereecke,* 609 F.3d at 400 (citations omitted). Since Defendant Daley did not deprive Plaintiff of a constitutional right concerning Plaintiff's Open Records Requests, Defendant Daley is entitled to qualified immunity pertaining to Plaintiff's retaliation claim. Furthermore, even if Defendant Daley was not entitled to qualified immunity on this issue, Defendant Daley would still be entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff has not established a *prima facie* case of retaliation, and Defendants have shown a legitimate, non-retaliatory reason for why Plaintiff was transferred.

### b. PLAINTIFF'S EIGHTH AMENDMENT CLAIM

Plaintiff argues Defendants subjected him to cruel and unusual punishment by not sending all of his medications with him when was transferred from CCDC to TCDC, which allegedly

resulted in Plaintiff becoming ill and having to be "hospitalized within two weeks for hypertensive conditions." [R. 2, at 5]. Under the Eight Amendment, there is a "prohibition on subjecting prisoners to 'unnecessary and wanton infliction of pain,' which includes the 'deliberate indifference to serious medical needs.'" *Linden v. Washtenaw County,* 167 F. App'x 410, 415 (6th Cir. 2006) (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). "Deliberate indifference 'entails something more than mere negligence,' and requires that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hubbard v. Gross,* No. 05-5088, 2006 WL 2787044, at *4 (Sept. 27, 2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

The Court need not consider whether Defendant Daley was deliberately indifferent to Plaintiff's medical needs because Plaintiff's argument is not factually supported by the evidence in the record. Specifically, when Plaintiff was transferred to TCDC, CCDC sent the medication Plaintiff had been taking at CCDC along with Plaintiff, including Clonidine, HCTZ, and Glimepiride, and made the Transportation Officer aware of Plaintiff's heart condition. [R. 41-4; R. 41-5; R. 41-14; R. 43, at 19]. Moreover, during Plaintiff's deposition, Plaintiff admitted that he signed a log at TCDC acknowledging he "received [his] medication starting January 21, 2016 through January 31, 2016 . . . ." [R. 43, at 21]; *see also* [R. 41-18]. Furthermore, while Plaintiff did have to be hospitalized on two occasions after arriving at TCDC, Plaintiff's hospitalization was not the result of Plaintiff not having his medication. [R. 41-19]. Instead, according to Dr. Travis Calhoun, the physician at TCDC, Plaintiff's hospitalization was due to "[Plaintiff's] blood pressure [being] uncontrollable with medication prescribed . . . ." *Id.* Also, Plaintiff's January 28, 2016 hospital discharge report showed Plaintiff's "home medications" consisted of Clonidine, HCTZ (hydrochlorothiazide), Glimepiride, and K-Dur Oral. [R. 41-20]. Since Defendant Daley

did not deprive Plaintiff of a constitutional right, Defendant Daley is entitled to qualified immunity pertaining to Plaintiff's Eighth Amendment claim. Furthermore, even if Defendant Daley was not entitled to qualified immunity pertaining to Plaintiff's Eighth Amendment claim, the undersigned recommends Defendant Daley is entitled to summary judgment on Plaintiff's Eighth Amendment claim because the record shows Plaintiff was not, in fact, transferred without his medication.

### c. PLAINTIFF'S CONSPIRACY CLAIM

Since the undersigned recommends Defendant Brandt is entitled to summary judgment in his official and individual capacity, Defendant Daley is entitled to qualified immunity, and Plaintiff was not deprived of a constitutional right, under either the First or Eight Amendment, the Court need not consider whether there was a conspiracy to deprive Plaintiff of such a right.

### 3. PLAINTIFF'S KENTUCKY OPEN RECORDS ACT CLAIM

In addition to Plaintiff's federal claims, Plaintiff seeks summary judgment on his claim that Defendants violated the Kentucky Open Records Act ("KORA"). In a 42 U.S.C. § 1983 civil action for deprivation of rights, such as Plaintiff's KORA claim presently before the Court, "A plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Violett v. Cohron,* No. 1:15-cv-P142-GNS, 2016 WL 1421200, at *3 (W.D. Ky. Apr. 8, 2016) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). However, in the present case, it has been shown herein that Defendants, particularly Defendant Brandt, complied with KORA, specifically K.R.S. § 197.025. Therefore, while making an Open Records Request is constitutionally protected conduct, Plaintiff has not shown Defendants violated that right, so the undersigned recommends Defendants are entitled to summary judgment on Plaintiff's KORA claim.

18

Furthermore, even if Defendants had violated KORA, Plaintiff has not followed the required procedure for challenging the alleged denial of his Open Records Requests. In general, a person who believes a public agency has not complied with KORA in relation to the person's request for public records generally has two options: they can appeal administratively to the Kentucky Attorney General, pursuant to K.R.S. § 61.880, or appeal judicially to the circuit court of the country in which the public agency is located, pursuant to K.R.S. § 61.882. However, under K.R.S. § 197.025(3), an inmate "shall challenge any denial of an open record with the Attorney General by mailing or otherwise sending the appropriate documents to the Attorney General within twenty (20) days of the denial pursuant to the procedures set out in K.R.S. § 61.880(2) before an appeal can be filed in a Circuit Court."

In the present case, Plaintiff did not challenge the alleged denial of his Open Records Requests, or the alleged failure to respond to his Open Records Requests, to either the Attorney General or the Circuit Court. [R. 43, at 12-14, 16]. During Plaintiff's deposition, the following exchange between Defendants counsel and Plaintiff showed Plaintiff was aware of the proper procedure for challenging Open Records Requests decisions:

> Q. Are you aware that under the Kentucky Open Records Act there are other options such as filing an appeal with the Kentucky attorney general?
>
> A. Well, yeah, okay, you're right. I'm sorry, you have to go through the attorney general first, then go to court. At that time, as you know, as I've already said, there was a schism between me and the attorney general's office and was getting nowhere.

[R. 43, at 12]. Plaintiff's reasoning for not appealing the decisions made regarding his Open Records Requests to the Kentucky Attorney General was because there was an alleged conflict of interest with the Kentucky Attorney General because Plaintiff allegedly threatened to sue the Kentucky Office of Attorney, and the Kentucky Attorney General had allegedly "told [Plaintiff]

[they would not honor] any requests from an opinion from [Plaintiff]." *Id.* at 12-13. Plaintiff stated his allegation that the Kentucky Attorney General would not honor his requests was supported by a letter from Assistant Attorney General Benjamin Long dated on or about September 23, 2015, but the alleged letter is not in the record. *Id.* at 12. Also, Plaintiff explained his reason for not appealing to the Circuit Court by stating, "In order to do that, according to the Open Records Act, I would have had to file an appeal in Campbell Circuit court. It puts me back in front of the judge that nailed me. I didn't really like that aesthetic." *Id.* Since Plaintiff has admittedly not availed himself of the aforementioned state appellate procedure for challenging denials of Open Records Requests, and failed to provide any reasonable excuse for not availing himself, he cannot state a claim under 42 U.S.C. § 1983 for a violation of the Kentucky Open Records Act. *Violett,* 2016 WL 1421200, at *5 (citing *McCollough v. Hale,* No. 15-CV-691, 2015 U.S. Dist. LEXIS 155373, at *10-11 (E.D.N.Y. Nov. 17, 2015)). Therefore, the undersigned recommends Defendants' Motion for Summary Judgment [R. 41] be granted regarding Plaintiff's KORA claim and all other claims.

## B. DISMISSAL UNDER 28 U.S.C. § 1915(e)(2)(B)(i)

In addition to considering Defendants' Motion for Summary Judgment [R. 41], "the Court has an obligation under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A to dismiss prisoner complaints *sua sponte* when they fail to state a claim, are frivolous, or seek monetary relief from immune defendants." *Lindensmith v. Walton,* No. 14-13342, 2016 WL 398292, at *2 (E.D. Mich. Jan. 25, 2016) (citing *In re Prison Litig. Reform Act,* 105 F.3d 1131, 1134 (6th Cir. 1997)). Specifically, 28 U.S.C. § 1915(e)(2)(B)(i), regarding proceedings *in forma pauperis,* provides, "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall

dismiss the case at any time if the court determines that . . . the action or appeal . . . is frivolous or malicious . . . ."

While the undersigned recommends Defendants' Motion for Summary Judgment [R. 41] be granted under Federal Rule of Civil Procedure 56(a), dismissal does not necessarily mean the case was frivolous within the meaning of 28 U.S.C. § 1915(e)(2)(B)(i). *See Neitzke v. Williams,* 490 U.S. 319, 320-331 (1989) (finding dismissal under Federal Rule of Civil Procedure 12(b)(6) does not necessarily mean the case was frivolous within the meaning of 28 U.S.C. § 1915(d), the substance of which is now found in 28 U.S.C. § 1915(e)(2)(B)(i)). Instead, under 28 U.S.C. § 1915(e)(2)(B)(i), "a complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or fact." *Neitzke,* 490 U.S. at 325.

Here, in Defendants Motion to Declare Plaintiff a Vexatious Litigator [R. 44], Defendants allege Plaintiff's claims are frivolous, and the Court agrees. [R. 44, at 14]. Plaintiff filed both his Complaint [R. 2] and his Motion for Summary Judgment [R. 40], even though Defendants responded to Plaintiff's Open Records Request in accordance with K.R.S. § 197.025, Defendants sent Plaintiff's medicine with him when he was transferred to TCDC [R. 41-14], and Plaintiff has provided no plausible evidence to show he was deprived of his First or Eighth Amendment rights. Since Plaintiff's claims are both legally and factually contrary to what the evidence shows occurred, both Plaintiff's Complaint [R. 2] and Motion for Summary Judgment [R. 40] are frivolous pleadings with no "arguable basis either in law or in fact." *Neitzke,* 490 U.S. at 325. Accordingly, the undersigned recommends, in the alternative: Plaintiff's claims be dismissed as frivolous, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i); the dismissal count as a strike under 28 U.S.C. § 1915(g); and that any appeal not be certified as taken in good faith under 28 U.S.C. § 1915(a)(3).

## C. DEFENDANTS' MOTION TO DECLARE PLAINTIFF A VEXATIOUS LITIGATOR

Defendants move to declare Plaintiff a vexatious litigator because Defendants allege Plaintiff "is a prolific *pro se* litigant with a long history of misusing his *in forma pauperis* status to file frivolous lawsuits against governmental entities and officials." [R. 44, at 3]. As support, Defendants provide summaries of fourteen (14) cases Plaintiff has filed in seven (7) different courts since December 22, 2014, excluding the present case. *Id.* As of November 30, 2017, the day Defendants filed their Motion [R. 44], ten (10) of Plaintiff's fourteen (14) cases had been dismissed, three (3) cases were so early in proceedings that dispositive motions had not yet been considered, and one (1) case's, *Bonds v. Univ. of Cincinnati Med. Ctr.*, No. 1:15-cv-00641-KLL (S.D. Ohio), dispositive motion deadline was the same day Defendants filed their Motion [R. 44]. [R. 44, at 3]. When allowed to proceed past the early stages of the aforementioned cases, Plaintiff has shown a continued pattern of frivolous and abusive behavior toward opposing parties and their counsel. *See* [R. 44]. Not only do Defendants allege Plaintiff exhibited frivolous and abusive behavior in the past, but Defendants also allege Plaintiff has been frivolous and abusive in the present case. The Court will discuss Plaintiff's history of frivolous and abusive behavior below.

### 1. PLAINTIFF'S FRIVOLOUS AND ABUSIVE CONDUCT IN OTHER CASES

First, on December 22, 2014, Plaintiff filed a state court action in Boone Circuit Court, *Bonds v. Walton-Verona Independent Bd. of Educ.,* No. 14-CI-01854 ("*WVBOE I*"), alleging the Walton-Verona Independent Board of Education ("WVBOE") "racially discriminated against him in connection with his employment as a teacher there, and that WVBOE had attempted to murder him by putting a contract hit out on him." [R. 44, at 4-5 (citing [R. 44-2])]. After Plaintiff repeatedly contacted representatives of WVBOE directly and failed to comply with Donald Ruberg's, WVBOE's counsel, request for Plaintiff to not do so, the Court granted WVBOE's

motion to restrict Plaintiff from contacting representatives of WVBOE directly. [R. 44, at 5 (citing [R. 44-3; R. 44-4])]. On April 12, 2017, the Court granted the defendant's motion for summary judgment and dismissed all claims against WVBOE. [R. 44-1].

Second, while *WVBOE I* was pending in state court, on April 16, 2015, Plaintiff, doing business as McScome Communications, Plaintiff's "own media entity," filed a complaint in the Eastern District of Kentucky alleging, in part, that WVBOE, Mr. Ruberg, and Mr. Ruberg's law firm "threatened to use white privilege in the form of arrests of [Plaintiff] while Plaintiff is in the course of covering and delivering the news of the [WVBOE] – a public agency." Complaint, R. 2, at 2, *Bonds v. Walton-Verona Independent Board of Education,* No. 2:15-cv-00053-DLB-CJS ("*WVBOE II"); see also* [R. 44, at 5-6]. Plaintiff's aforementioned allegation was based in part on Mr. Ruberg asking Plaintiff to refrain from contacting representatives of WVBOE directly in *WVBOE I.* Plaintiff's Combined Answer, R. 20, at 4-5, *WVBOE II,* No. 2:15-cv-00053-DLB-CJS.

In *WVBOE II*, Plaintiff exhibited abusive behavior toward the opposing parties and their counsel, Mr. Ruberg, including accusing WVBOE, Mr. Ruberg, and Mr. Ruberg's law firm of being racists, elitists, sexists, homophobes, and white supremacists. Plaintiff's Combined Answer, R. 20, at 3-7, *WVBOE II,* No. 2:15-cv-00053-DLB-CJS. Additionally, after Plaintiff allegedly accused Mr. Ruberg of being dishonest and lying, Mr. Ruberg informed Plaintiff that Mr. Ruberg would only communicate with Plaintiff via letter or e-mail. [R. 44-5]. Plaintiff responded by comparing Mr. Ruberg to Muhammad Ali and stating, "[A]fter Friday, we'll find out if you are Ali vs. Joe Frazier; or Ali vs. Larry Holmes," which could be interpreted as Plaintiff mocking Mr. Ruberg, at best, and threatening Mr. Ruberg, at worst. On March 21, 2016, the Court dismissed Plaintiff's claims and found "Plaintiff's assertion that either counsel or the Defendants lied to the Court is wholly unfounded." Order, R. 40, at 2, *WVBOE II,* No. 2:15-cv-00053-DLB-CJS.

23

Third, on October 2, 2015, Plaintiff filed an action in the Southern District of Ohio, *Bonds v. Univ. of Cincinnati Med. Ctr., et al.,* No. 1:15-cv-00641-KLL, against the University of Cincinnati Medical Center ("UC"), UC's security staff employee Mike Posey, UC's security staff, then-Kentucky Attorney General Jack Conway and his office, and two unknown Kentucky State Police Officers. [R. 44, at 6; R. 44-21]. Plaintiff alleged that on or about September 2, 2015, UC, security staff, and Mr. Posey violated Plaintiff's rights as a patient, worsened Plaintiff's condition which caused Plaintiff "mental & physical anguish," and Mr. Posey threatened to harm Plaintiff, called Plaintiff names, and disrespected Plaintiff "in an attempt to air a 20+ year grievance between the two." [R. 44-6, at 3]. Plaintiff's Request for Admissions suggests Plaintiff may have believed the aforementioned grievance stemmed from Mr. Posey feeling angry because Plaintiff made the Western Hills High School baseball team in the early 1990s, and Mr. Posey did not. [R. 44-7].

During litigation, Bill Paliobeis, counsel for UC, requested a conference with the Court because "efforts by Counsel to address any discovery dispute with [Plaintiff] quickly deteriorated into a barrage of unilateral personal insults, accusations and vulgar name calling by [Plaintiff]." [41-9, at 1]. With the request, Mr. Paliobeis attached emails documenting Plaintiff's abusive behavior, including the following: Plaintiff accused Mr. Paliobeis of being a white supremacist who insulted Plaintiff, which led Plaintiff to threaten Mr. Paliobeis by saying, "I don't take well to insults. Ask Posey what happened to him our sophomore year when he got fly with his mouth. My right jab was restaurant quality that day. He should remember . . . Watch your tone homeboy" [R. 44-9, at 21-22]; Plaintiff accused Mr. Paliobeis of being "stubborn" and trying to "humiliate and bully" Plaintiff [R. 44-9, at 10]; Plaintiff accused Mr. Paliobeis of being "a complete non compliant adjective of reproach" [R. 44-9, at 18]; Plaintiff accused Mr. Posey of posting a racially-charged threat toward Plaintiff on social media, but Plaintiff neither cited where Mr. Posey posted

the alleged threat nor produced a copy of the social media post [R. 44-9, at 22]; Plaintiff emailed George Yund, managing partner of Mr. Paliobeis's law firm, and Richard Moore, an allegedly African-American attorney at Mr. Paliobeis's law firm, to inform Mr. Yund that Plaintiff believed Mr. Paliobeis to be an "unmitigated, raging jerkoff" with "somewhat racist" rhetoric who "talks to [Plaintiff] like [he is] a child or worse his slave" [R. 44-9, at 26-27]; and when Mr. Paliobeis asked Plaintiff to only communicate with Mr. Paliobeis in writing, Plaintiff accused Mr. Paliobeis of continuing "to threaten and harass [Plaintiff]" and mentioned Mr. Paliobeis's "expected privilege as a white male" and "suspected white supremacist behavior" [R. 44-9, at 34].

In addition to Plaintiff's abusive behavior toward Mr. Paliobeis, Plaintiff was abusive toward the Kentucky Office of Attorney General in the following ways: Plaintiff suggested Michelle Harrison, an Assistant Attorney General, was "paid" for her decision regarding an open records request [R. 44-10]; Plaintiff referred to Ms. Harrison's aforementioned decision as a "stupid ass, ridiculous decision" that allowed "[Mr.] Ruberg to submit to the court a fraudulent of a document," and Plaintiff stated, "This is bullshit. You guys need to be dealt with" [R. 44-11]; Plaintiff then repeatedly referred to Ms. Harrison's decision as "fuckery" and stated, "I WANT TO SPEAK WITH THE GOD DAMNED ATTORNEY GENERAL" [R. 44-12]; Plaintiff threatened to file a bar complaint against Robyn Bender, another Assistant Attorney General, as he claimed to have done to Ms. Harrison and Mr. Ruberg [R. 44-14]; Plaintiff referred to Ms. Harrison as "the racist lady who doesn't question white men, like a Stepford wife is taught not to do? I mean with opinion 15-ORD-015, she set women's and civil liberties back about 100 years. I hope she is proud" [R.44-14]; Plaintiff complained that Amye Bensenhaver, another Assistant Attorney General, had "sent my responses to [Mr.] Ruberg, a man who tried to have me killed while dropping papers off at his office" by having police officers come to Mr. Ruberg's law office

"with their chest full of the hot air that is White Supremacy" [R. 44-15]; after leaving allegedly threatening voicemails for Benjamin Long, another Assistant Attorney General, and other Assistant Attorney Generals, Plaintiff accused Mr. Long of being an "asshole" and suggested Mr. Long and Ms. Bender were racists and that they were "blocking for a white supremacist agency" [R. 44-15; R. 44-16]; Plaintiff accused Ms. Harrison of accepting a "bribe" in return for issuing what Plaintiff refered to as her "bullshit" decision [R. 44-18]; after accusing the Kentucky Office of Attorney General of being "protective of the white supremacist," Plaintiff stated, "Oh yeah, fuck you Michelle Harrison and Robyn Bender. Please do the citizens of the Commonwealth a favor and eat shit and die. You too Benjamin [Long] for giving out fake email addresses . . . And fuck John William 'Jack' Conway too" [R. 44-18]; Plaintiff called Ms. Bender, Ms. Harrison, and Mr. Long "no good, low down rotten pieces of shit" [R. 44-19]; on July 14, 2015, Plaintiff visited the Kentucky Office of Attorney General's main office, met with Mr. Long, and Mr. Long ended the meeting after Plaintiff "[stated] that 15-ORD-015 was 'worse than the Charleston shooting'" [R. 44-20]; and after Plaintiff's statements made in voicemails, in e-mails, on social media, and in person, the Kentucky State Police advised the staff of the Kentucky Office of Attorney General not to have contact with Plaintiff due to concerns for their physical safety [R. 44-20].

On August 24, 2017, the Court dismissed Defendants UC, UC security staff, and Mr. Posey from the case. [R. 44-21]. The Court found Plaintiff was allowed to take the deposition of Defendant Conway, but the Court ordered the "deposition must take place in the ADR Suite of the Courthouse Building in Cincinnati, Ohio . . . ." *Id.*

Fourth, on December 15, 2015, Plaintiff filed a complaint in the Eastern District of Kentucky, *Bonds v. Southern Health Partners, Inc., et al.,* No. 2:15-cv-00209-WOB, alleging CCDC and Southern Health Partners, Inc. violated his rights by subjecting him to "humiliation,

intimidation, retaliation and abuse" when he would try to assert his rights regarding prescription medication. Complaint, R. 1, *Id.* Plaintiff proceeded to file a first, second, and third amended complaint, but despite filing several amendments, Plaintiff's primary claims remained that he was allegedly "denied proper medication for his diabetes condition" and defendants retaliated against him for questioning the medication administered to him." Memorandum Opinion and Order, R. 19, at 1-2, *Id.*. On April 6, 2016, prior to receiving an answer from either defendant, the Court dismissed Plaintiff's federal claims with prejudice for failure to state a claim upon which relief could be granted. *Id.* Additionally, the Court certified "that any appeal would not be taken in good faith." Judgment, R. 20, *Id.* (citing 28 U.S.C. § 1915(a)(3)).

Fifth, on or about February 3, 2016, Plaintiff filed a complaint in the Western District of Kentucky, *Bonds v. Todd County Detention Center, et al.,* No. 1:16-cv-00016-GNS, alleging TCDC, the Kentucky Department of Corrections, and TCDC employees tampered with evidence, intimidated a witness, destroyed open records, intended to subvert the Open Records Act, engaged in human trafficking, obstructed justice, and unlawfully manipulated open records. [R. 44-22, at 3]. On September 30, 2016, the Court dismissed all of Plaintiff's claims for failure to state a claim, except one: "Plaintiff's Eighth Amendment claim relating to his lack of treatment for his blood pressure for 13 hours and the falsification of his blood pressure reading . . . ." [R. 44-23].

Sixth, on or about April 27, 2016, Plaintiff filed a complaint against Rick Rowlette, Warden of the Blackburn Correctional Complex, and other employees of the Kentucky Department of Corrections in the Eastern District of Kentucky, *Bonds v. Rowlette, et al.,* No. 5:16-cv-00124-DCR, alleging the defendants retaliated against Plaintiff, destroyed Open Records, tampered with evidence, harassed a witness, censored Plaintiff, failed to give due process, and were guilty of cruel and unusual punishment. Complaint, R. 1, *Id.* On October 26, 2016, before any of the

defendants were able to answer Plaintiff's complaint, the Court granted Plaintiff's request to voluntarily dismiss the case without prejudice. Order Granting Voluntary Dismissal, R. 11, *Id.*

Seventh, on or about May 25, 2016, Plaintiff initiated a state court action against Mr. Rowlette and others in Fayette Circuit Court, *Bonds v. Rowlette (Warden), et al.,* No. 16-CI-01947, and as of the filing of the present Motion [R. 44], the aforementioned state court action against Mr. Rowlette and others is ongoing. [R. 44, at 12 (citing [R. 44-24])].

Eighth, on or about July 15, 2016, Plaintiff initiated a state court action against the Blackburn Correctional Complex and another defendant in Fayette Circuit Court, *Bonds v. Blackburn Correctional Complex, et al.,* 16-CI-02583. On March 2, 2017, the action was dismissed with prejudice. [R. 44-25].

Ninth, on or about July 26, 2016, Plaintiff filed a complaint in the Eastern District of Kentucky, *Bonds v. Office of Attorney General, et al.,* No. 3:16-cv-00050-GFVT, suing the Kentucky Office of Attorney General, Kentucky State Police, Justice and Public Safety Cabinet, and others "for damages under 42 U.S.C. 1983; 42 U.S.C. 1985 and 42 U.S.C. 1986 for the discrimination, conspiratorial, retaliatory and politically driven methods employed by all to violate Plaintiff's First and Fourth Amendment rights . . . ." Complaint, R. 1, *Id.* On October 7, 2016, on Plaintiff's motion, before any defendant filed an answer, the Court dismissed the case without prejudice. Order of Dismissal, R. 8, *Id.*

Tenth, on or about July 15, 2016, Plaintiff initiated a state court action against Scott Jordan, Warden of the Luther Luckett Correctional Complex, in Oldham Circuit Court, *Bonds v. Jordan,* No. 16-CI-00387. [R. 44-26]. On September 13, 2016, the Oldham Circuit Court dismissed the case. *Id.*

Eleventh, on or about July 15, 2016, Plaintiff initiated a state court action against Ravonne Sims, Warden of the Roederer Correctional Complex, and other Roederer Correctional Complex employees in Oldham Circuit Court, *Bonds v. Sims,* No. 16-CI-00388. [R. 44-27]. On October 17, 2016, the Oldham Circuit Court dismissed the case. *Id.*

Twelfth, in November 2016, Plaintiff filed a complaint in the Western District of Kentucky, *Bonds v. Oldaker, et al.,* No. 3:16-cv-00724-JMH-DW, alleging nurses employed by Correct Care Solutions "used racial slurs against him during their treatment of him while he was housed at the Luther Luckett Correctional Complex." [R. 44, at 13 (citing *Bonds v. Oldaker, et al.,* No. 3:16-cv-00724-JMH-DW)]. Before any defendant could answer, the Court dismissed all but two of the defendants. [R. 44, at 13 (citing Order, R. 5, *Bonds v. Oldaker, et al.,* No. 3:16-cv-00724-JMH-DW)]. "The remaining Defendants recently held a Rule 26 planning meeting." [R. 44, at 13 (citing Report, R. 20, *Bonds v. Oldaker, et al.,* No. 3:16-cv-00724-JMH-DW)].

Thirteenth, on or about November 7, 2016, Plaintiff initiated a state court action against Lt. Jesse Catlett, Scott Jordan, Warden of the Luther Luckett Correctional Complex, and others in Oldham Circuit Court, *Bonds v. Catlett, et al.,* No. 16-CI-00642. [R. 44-28]. On April 19, 2017, the Oldham Circuit Court dismissed the case. *Id.*

Fourteenth, on or about November 1, 2017, Plaintiff initiated a state action in Franklin Circuit Court, *Bonds v. Department of Corrections, et al.,* No. 17-CI-01026. [R. 44-29]. On November 9, 2017, a motion to dismiss was filed in the case. *Id.*

## 2. PLAINTIFF'S FRIVOLOUS AND ABUSIVE BEHAVIOR IN THE PRESENT CASE

In addition to behaving frivolously and abusively in the past, Plaintiff's behavior has been frivolous and abusive in the present case. [R. 44, at 4]. In doing so, Plaintiff has made what should have been routine discovery unreasonably difficult for Defendants' counsel. [R. 44, at 14-18].

Specifically, on June 12, 2017, Plaintiff answered Defendants' Request for Production of Documents with the following: "[T]here is a . . . tape recorded meeting with TCDC Jailer Greg Allen available if the Counsel is willing to meet Plaintiff in Cincinnati to retrieve the same." [R. 44-31, at 4]. Initially, Plaintiff offered to "hand-deliver the [recorded conversation] to a copying agent in Ohio." [R. 44-32]. When Defendants' counsel asked for a specific date, time, and location to pick up the recording [R. 41-17; R. 42], Plaintiff responded, "You can come to Cincinnati on Harrison Ave at the Save A Lot food store any weekday morning. I don't work there but can meet you there." [R. 44-33]. Defendants' counsel suggested Plaintiff bring the requested recording to the Hamilton County Courthouse instead, and counsel stated he would have a law clerk meet Plaintiff there to pick up the recording. [R. 44-34]. Plaintiff responded that he would be downtown the following day, August 8, 2017, at 9 a.m., but Plaintiff said, "I'm not turning over the tape. I'll let your person take a brief listen and even take a photo of the micro cassette." [R. 44-35].

After Plaintiff requested to know, and was told, who would be picking up the recording, Plaintiff cancelled the meeting by stating, "Damn it. I waited for a response and now I'm out and the stuff is at a secure location that I cannot get to until tomorrow afternoon." [R. 44-36]. Defendants' counsel requested another date and time Plaintiff would be able to meet at the Hamilton County Courthouse [R. 44-37]. Plaintiff refused to meet and stated, "I can tell you right now that I don't anticipate being downtown again this week. As I said, you should be able to get the information from TCDC folks," which was in reference to Greg Allen, TCDC Jailer, who Plaintiff claimed "threw [Defendant] Daley and the rest of CCDC under the bus and it was recorded." [R. 44-38]. Defendants' counsel advised Plaintiff that counsel intended to contact the Court to request a telephone conference call regarding Plaintiff's failure to produce the recording

[R. 44-39], and Plaintiff responded, "When are [sic] coming to get this tape? You must come. I don't deal with lackeys." [R. 44-40].

On August 23, 2017, Plaintiff notified Defendants' counsel that Plaintiff would be at the Potter Stewart Courthouse on August 30, 2017 at 9 a.m., and that Defendants' counsel or a "lackey" could get the recording from Plaintiff on that date and at that location. [R. 44-41]. However, Plaintiff included the following condition in his offer to deliver the recording: "If the tape is altered mutilated, etc. erstwhile not playable, your client will have to pay me $25,000 USD as it is very valuable evidence in my claims against your client." *Id.* When Defendants' counsel agreed to have a law clerk meet Plaintiff at the Potter Stewart Courthouse, Plaintiff responded, "In all seriousness make that noon at the courthouse. My barber moved the appointment up on me today after I emailed it to you." [R. 44-42]. Then, on August 25, 2017, Plaintiff moved the time he would deliver the recording to 1 p.m. [R. 44-43].

On September 29, 2017, after Defendants' counsel sought the Court's intervention, the Court ordered Plaintiff to produce the recording to a neutral third party of Defendants' counsel's choosing, so the neutral third party could make a copy for Defendant and return the original to Plaintiff. [R. 35]. After Defendants' counsel identified the neutral third party and instructed Plaintiff how to contact the neutral third party, Plaintiff responded, "If the shop is anywhere close to affiliated with your law firm, then the shop supports white supremacy. I will not contact a white supremacist. Just tell him I'll be there Monday between 1 and 2." [R. 44-44]. Defendants' counsel relayed Plaintiff's proposed delivery time to the neutral third party who was unable to meet until closer to 2:00 p.m. [R. 44-45]. When Defendants' counsel notified Plaintiff that the neutral third party would not be able to meet until closer to 2:00 p.m., Plaintiff responded, "If this white supremacist has a gun in his office, I'm leaving." *Id.*

In addition to being difficult and abusive regarding the recording, on July 12, 2017, when Defendants' counsel sought to arrange to take Plaintiff's deposition, Plaintiff refused to come to Kentucky. [R. 44, at 16]. Plaintiff's reason for refusing was as follows: "I will not return to your state other than for trial. Somebody is trying to kill me and I believe [Campbell County Attorney] Steve Franzen's office is aware of this." [R. 44-32]. On July 14, 2017, Plaintiff reiterated his position on coming to Kentucky for a deposition by stating, "[A]ny depositions will be done at the Potter Stewart Federal Courthouse in Cincinnati on neutral ground. I won't feel safe anywhere else and I'm trying to avoid white supremacists at all costs." [R. 44-46]. On August 15, 2017, Plaintiff reiterated his position again by stating, "I'm not coming to Kentucky unless we're going to trial. Your state is deluged with hate for Negroes." [R. 44-47]. On September 14, 2017, Plaintiff stated, "I'm gonna give you until Monday 9/18/17 to agree to perform the deposition in the Cincinnati Federal Courthouse because of conflict of interests in Kentucky." [R. 44-48]. On September 29, 2017, the Court ordered Plaintiff to appear for a deposition in the United States Courthouse in Covington, Kentucky. [R. 35].

Throughout the present case, Plaintiff has exhibited similar abusive behavior to that of the past cases where he was allowed to proceed *in forma pauperis*. Specifically, Plaintiff has done the following:  Plaintiff accused Defendants' counsel and his law firm of representing white supremacists and "more than likely support[ing] white supremacy" [R. 44-46]; on August 15, 2017, three days after a protestor was killed by a motorist in what many believed to be a racially charged rally in Charlottesville, Virginia, Plaintiff e-mailed Defendants' counsel and stated, "Why can't I get you on the phone? You act like you were in Charlottesville, VA over the weekend . . . or wanted to be there" [R. 44-50]; again, Plaintiff suggested Defendants' counsel's involvement in the Charlottesville rally by stating, "You found time to be Charlottesville this past weekend,

didn't you" [R. 44-51]; Plaintiff threatened to file a bar complaint against Defendants' counsel for failing to "communicate [Plaintiff's] offer of alternative trail to [Defendants]" [R. 44-52]; Plaintiff accused Defendants' counsel of making "repeated insults and berating" Plaintiff and of "insolence and disrespect for [Plaintiff and] the process" [R. 44-52]; when Defendants' counsel explained that he had not insulted or berated Plaintiff, Plaintiff responded, "Very typical of a defender of a white supremacist to tell me how I am supposed to feel and take your rhetoric. You sound like a guy who tells women they weren't raped" [R. 44-53]; Plaintiff accused Defendant Daley's ancestors of the following: "As Mr. Daley's ancestor's [sic] used to say when they hanged black people, 'The jig is up'" [R. 44-53]; Plaintiff accused Defendants' counsel of choosing not to reach an amicable agreement because counsel would "rather wait and bilk [his] client for as many billable hours as possible" [R. 44-43]; after Defendants' counsel turned down Plaintiff's settlement demands, Plaintiff responded, "Don't insult me or the process" [R. 44-54]; in response to an email attaching Defendants' discovery responses, Plaintiff sent Defendants' counsel the following e-mail:

> Hey Lil Jeff, You'se is gon haf to relooks at da last two admitions, suh. I'se means no disrespect suh. I'se just a slave trying to prove a case, suh. Is you not gon readdress Dems questions, den mees is gon add it to da disckovey issah wiff the Cote.

[R. 44-55]; Plaintiff told Defendants' counsel to "[s]top being so petulant while trying to communicate under the guise of being a professional barrister" [R. 44-46]; and Plaintiff accused Defendants' counsel of lying about sharing Plaintiff's settlement demands with Defendants [R. 44, at 18].

## 3. WHETHER THE COURT SHOULD DECLARE PLAINTIFF A VEXATIOUS LITIGATOR

Due to Plaintiff's frivolous and abusive conduct in both past cases and the present case, Defendants ask the Court to declare Plaintiff a vexatious litigator, prohibit Plaintiff from "filing

any additional complaints or other pleadings in the Eastern District of Kentucky unless an attorney in good standing with the Court is willing to certify that the complaint or other pleading is not frivolous," and prohibit Plaintiff from "proceeding *in forma pauperis* before the Court." [R. 44, at 20-21]. To support Defendants' requests, Defendants cite to an Eastern District of Kentucky case, *Johnson v. Bunko,* No. 5:06-cv-00175-JMH, in which the Court found "the Court possesses the inherent authority to prevent abuse of the judicial process by enjoining those who file multiple, frivolous, or malicious pleadings." Opinion and Order, R. 3, at 6, *Johnson v. Bunko,* No. 5:06-cv-00175-JMH (citing *Filipas v. Lemons,* 835 F.2d 1145, 1146 (6th Cir. 1987); *Chambers v. Nasco, Inc.,* 501 U.S. 32, 44 (1991)).

"The only special consideration to which a pro se litigant is entitled is to have his pleadings construed liberally by the court." *Gueye v. U.C. Health,* No. 1:13-cv-673, 2014 WL 4984173, at *5 (S.D. Ohio Oct. 6, 2014) (citing *Boswell v. Mayer,* 169 F.3d 384, 387 (6th Cir. 1999)). A pro se litigant must still comply with the Federal Rules of Civil Procedure. *Gueye,* 2014 WL 4984173, at *5 (citing *McNeil v. United States,* 508 U.S. 106, 113, (1993); *In re G.A.D., Inc.,* 340 F.3d 331, 335 (6th Cir. 2003)). "A pro se litigant is not excused from the requirement to show appropriate courtesy and respect to the Court. A pro se litigant is not entitled to make unfounded accusations that a court or judicial officer is biased or prejudiced or to insult the judge's competence." *Gueye,* 2014 WL 4984173, at *5 (citing *Mayberry v. Pennsylvania,* 400 U.S. 455, 462–63 (1971); *Maus v. Ennis,* 513 Fed. Appx. 872, 878 (11th Cir. 2013)). "A pro se litigant is not excused from the requirement to show appropriate courtesy and respect to opposing counsel." *Gueye,* 2014 WL 4984173, at *5. "A pro se litigant is not entitled to make unfounded ad hominem attacks on opposing counsel." *Gueye,* 2014 WL 4984173, at *5 (citing *McKenna v. Nestle Purina PetCare Co.,* No. C2–05–976, 2011 WL 14418, at *4 (S.D. Ohio Jan. 3, 2011)). "A pro se litigant is not

34

entitled to abuse the court system and its judicial officers, bombard the court with frivolous pleadings, and harass his opponent." *Gueye,* 2014 WL 4984173, at *5 (citing *Grider v. Irvin,* No. 1:06–CV–53–TBR, 2007 WL 4441214, at *4 (W.D. Ky. Dec. 17, 2007)).

In both Plaintiff's present case and his other cases, not only has Plaintiff failed to show courtesy and respect to the opposing parties and opposing counsel, Plaintiff has proven to be abusive and, at times, threatening. Additionally, Plaintiff has shown a continued pattern of being noncompliant with routine litigation procedures, such as producing discovery and scheduling depositions. In this case alone, Plaintiff's noncompliance has required several fruitless communications between Plaintiff and opposing counsel that only ended due to the Court's intervention. [R. 35]. Particularly troubling is the fact that Plaintiff's discovery dispute stemmed from Plaintiff's unfounded claims that opposing counsel, or someone associated with opposing counsel, may be a white supremacist or a supporter of white supremacists and Plaintiff's baseless concern that opposing counsel would destroy the recording. Likewise, Plaintiff's refusal to appear for a deposition in Kentucky was based on Plaintiff's unsubstantiated claim that "[s]omebody [was] trying to kill [him]." [R. 44-32]. When Plaintiff's current instances of noncompliance and abuse are considered alongside those of Plaintiff's other cases, it becomes clear that Plaintiff has a pattern of accusing opposing parties and opposing counsel of being either racists or white supremacists and an unsupported fear that people are trying to harm him.

Aside from showing Plaintiff has a history of abusive behavior that has continued in the present case, Defendants have shown Plaintiff frequently brings cases similar to the present case, where Plaintiff argues someone, often an employee of a detention center, has violated his civil rights or retaliated against him. After Plaintiff is allowed to proceed *in forma pauperis,* relatively early in the stages of litigation, Plaintiff's cases are often voluntarily dismissed or dismissed by

35

the Court. The similarities between Plaintiff's past claims and subsequent dismissals suggests Plaintiff is behaving frivolously, and since Plaintiff is *pro se* and proceeding *in forma pauperis*, his frivolity with the judicial process is costing him nothing while the parties who oppose him must bear the cost of defending themselves against Plaintiff's claims.

In cases such as this, "[t]he Court has at least two sources of authority to sanction Plaintiff for his misconduct." *Gueye,* 2014 WL 4984173, at *6. First, pursuant to Federal Rule of Civil Procedure 11(c)(1), the Court may "sanction a party for filing any pleading or motion without a good faith basis in law and fact." *Id.* As previously mentioned, both Plaintiff's Complaint [R. 2] and Motion for Summary Judgment [R. 40] are frivolous pleadings with no "arguable basis either in law or in fact." *Neitzke,* 490 U.S. at 325.

Second, "[a] court . . . has inherent authority to sanction pro se litigants for engaging in frivolous and harassing litigation conduct, as well as to punish disrespect or contempt for the court." *Gueye,* 2014 WL 4984173, at *6 (citing *First Bank of Marietta v. Hartford Underwriters Ins. Co.,* 307 F.3d 501, 514 & 514 n. 11 (6th Cir. 2002) (collecting cases); *In re Smothers,* 322 F.3d 438, 422 (6th Cir. 2003) (courts have the inherent authority to maintain respect and decorum); *Mitan v. International Fid. Ins. Co.,* 23 Fed. App'x. 292, 298 (6th Cir. 2001) ("The federal courts' inherent power to protect the orderly administration of justice and to maintain the authority and dignity of the court extends to a full range of litigation abuses.")). "Sanctions imposed under Rule 11 should be limited to what is needed to deter future misconduct." *Gueye,* 2014 WL 4984173, at *6 (citing *Rentz v. Dynasty Apparel Ind., Inc.,* 556 F.3d 389, 400 (6th Cir. 2009)). "On the other hand, sanctions imposed pursuant to a court's inherent authority are punitive and not limited to what is required to achieve deterrence." *Gueye,* 2014 WL 4984173, at *6 (citing *Stalley ex rel. United States v. Mountain States Health Alliance,* 644 F.3d 349, 352 (6th Cir. 2011)).

36

Sanctions imposed pursuant to the Court's inherent authority can require someone who "has abused the legal process to make a showing that a tendered lawsuit is not frivolous or vexatious before permitting it to be filed," but a person cannot be "absolutely foreclosed from initiating an action in a court of the United States." *Ortman v. Thomas,* 99 F.3d 807, 811 (6th Cir. 1996). Additionally, "where a plaintiff has demonstrated a 'history of unsubstantial and vexatious litigation [amounting to] an abuse of the permission granted to him to proceed as a pauper in good faith under 28 U.S.C. § 1915(d),'" the Court may prospectively deny "any future motions for *in forma pauperis*" and "[direct] the Clerk of the Court 'to return any complaints and/or petitions to [the plaintiff] unless accompanied by the appropriate filing fee.'" *Reneer v. Sewell,* 975 F.2d 258, 260-61 (6th Cir. 1992) (citing *Maxberry v. SEC,* 879 F.2d 222, 224 (6th Cir. 1989)).

In the present case, as Defendants assert, "[o]ther than imposing pre-filing restrictions, no sanction this Court can impose will deter [Plaintiff] from continuing to engage in misconduct." [R. 44, at 20]. Due to the fact Plaintiff is proceeding *in forma pauperis*, it is reasonable to assume Plaintiff would be unable to pay a monetary sanction. Likewise, Plaintiff's past conduct has shown an order directing him to behave in a respectful and non-abusive manner would likely be futile. Specifically, after the Court directed Plaintiff to provide the recording to a neutral third party for copying and Defendants counsel attempted to schedule a time for Plaintiff to drop off the recording, Plaintiff continued to be unreasonably difficult, responding, "If this white supremacist has a gun in his office, I'm leaving." [R. 44-45].

In response to Defendants' Motion [R. 44], Plaintiff neither refutes the facts and law in Defendants' Motion [R. 44] nor offers any excuse for his past frivolous and abusive behavior. Instead, pursuant to 28 U.S.C. § 1915(g), Plaintiff argues he should not be declared a vexatious litigator because "the Prison Litigation Reform Act requires that an inmate must have three (3)

cases dismissed for failure to state a claim, and Plaintiff hasn't had any as an inmate and one (1) while he was free man . . . ." [R. 46-1, at 3]. However, as discussed herein, the Court has the inherent authority to sanction vexatious litigants, and those sanctions can include prohibiting the litigant from proceeding *in forma pauperis. See Gueye,* 2014 WL 4984173, at *6 (citations omitted); *see also Reneer v. Sewell,* 975 F.2d 258, 260-61 (6th Cir. 1992).

Accordingly, the Court will recommend Defendants' Motion to Declare Plaintiff a Vexatious Litigator [R. 44] be granted and sanction Plaintiff in the following manner: (1) Plaintiff shall be prohibited from filing any additional complaints or other pleadings in the Eastern District of Kentucky unless an attorney in good standing with the Court is willing to certify that the complaint or other pleading is not frivolous; and (2) Plaintiff is prohibited from proceeding *in forma pauperis* before the Court.

## **RECOMMENDATION**

Therefore, having considered the matters fully, and being otherwise sufficiently advised, the undersigned RECOMMENDS:

1. Plaintiff's Motion for Summary Judgment [R. 40] be DENIED;

2. Defendants' Motion for Summary Judgment [R. 41] be GRANTED and Plaintiff's claim be DISMISSED WITH PREJUDICE;

3. Defendants' Motion to Declare Plaintiff a Vexatious Litigator [R. 44] be GRANTED;

4. Plaintiff be PERMANENTLY BARRED AND ENJOINED from filing any additional complaints or other pleadings in the Eastern District of Kentucky unless an attorney in good standing with the Court is willing to certify that the complaint or other pleading is not frivolous and is filed in good faith;

5.  Plaintiff be PERMANENTLY BARRED AND ENJOINED from proceeding *in forma pauperis* before the Court;

6.  The Clerk of Court be ORDERED NOT TO FILE any new civil action received from Todd Bonds unless Todd Bonds's complaint or other pleading is accompanied by a certificate from an attorney in good standing with the Court assuring the Court the complaint or other pleading is not frivolous and is filed in good faith; and

7.  The Clerk of Court ORDERED TO RETURN to Plaintiff UNFILED any complaint or petition received by Plaintiff that is not accompanied by the appropriate filing fee.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days from the date of service thereof or further appeal is waived. *United States v. Campbell*, 261 28 F.3d 628, 632 (6th Cir. 2001); *Bituminous Cas. Corp. v. Combs Contracting Inc.,* 236 F. Supp. 2d 737, 749-750 (E.D. Ky. 2002). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). A party may file a response to another party's objections within fourteen (14) days after being served with a copy thereof. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).

This the 21st day of February, 2018.



Signed By:

*Edward B. Atkins*  *EBA*

**United States Magistrate Judge**